**UNITED STATES of America,**
**Appellee,**

v.

**Raymond J. RYAN, Appellant.**
**No. 71-1165.**

United States Court of Appeals,
Ninth Circuit.

Dec. 13, 1971.

As Modified on Denial of Rehearing
March 7, 1972.

Trask, Circuit Judge, dissented in part and concurred in part in order amending opinion and filed opinion.

Herbert J. Miller (argued), Raymond G. Larroca, Nathan Lewin, of Miller,

Cassidy, Larroca & Lewin, Washington, D. C., Orrick, Herrington, Rowley & Sutcliffe, San Francisco, Cal., for appellant.

Marvin R. Loewy (argued), Philip R. Michael, of Dept. of Justice, Will Wilson, Asst. Atty. Gen., Crim. Div., Washington, D. C., Robert L. Meyer, U. S. Atty., David R. Nissen, Asst. U. S. Atty., Los Angeles, Cal., Philip R. Michael, Asst. U. S. Atty. (argued), James L. Browning, U. S. Atty., San Francisco, Cal., for appellee.

Before WEICK,* HUFSTEDLER and TRASK, Circuit Judges.

WEICK, Circuit Judge:

Appellant Ryan was convicted by a jury in the District Court of the offenses of obstruction of justice (18 U.S.C. § 1503) and of violation of 18 U.S.C. § 2. The conspiracy count in the indictment was dismissed. Ryan was sentenced to three years' imprisonment.

In his appeal, he assigns many alleged errors of law occurring at his trial, but his principal claim is that the Court erred in denying his several motions for judgment of acquittal.

On July 26, 1967, the Clerk of the District Court issued three identical duces tecum subpoenas calling for the appearance before the grand jury of Ray Ryan, Helen Hansen and Frank Hayden, c/o El Mirador Hotel, Palm Springs, California, on July 27, 1967, at 9:30 o'clock A.M. and to bring with them all records, papers and documents pertaining to the operation of Mawingo, Ltd., d. b. a. Mount Kenya Safari Club, Nanyuki, Kenya, East Africa.[1] The subpoenas bore the name and telephone number of the United States Attorney and his assistant.

The issuance and service of the subpoenas have an interesting background. Assistant United States Attorney David R. Nissen, on July 26, 1967, received a telephone call at his Los Angeles office, from an attorney (whose name he could not recall) in the Department of Justice in Washington, who requested that the subpoenas be issued. The Department of Justice attorney dictated over the telephone to Nissen's secretary, the duces tecum portions of the subpoenas.

Nissen testified that he assigned the matter to the Robertson Grand Jury, so-called, because of the name of its foreman. Nissen instructed his secretary to furnish the subpoenas to I.R.S. agents for service.[2]

---

* Honorable Paul C. Weick, Circuit Judge, United States Court of Appeals for the Sixth Circuit, sitting by designation.

1. The shares of stock of Mawingo, Ltd., the corporation which owned and operated the club, were held by actor William Holden, Swiss banker Carl Hirschmann, and Raymond Ryan, whose principal businesses were oil production and real estate development. A number of nationally prominent business, professional and political leaders were members of the club. Part of the club records were kept at the club in Kenya, East Africa, and some were maintained in Palm Springs, California, at Ryan's office in his hotel. Helen Hansen was Ryan's secretary.

2. Special Agents of I.R.S., headed by Special Agent Glen Johnson, had been investigating Ryan and his companies since 1964. The investigation was inspired by publicity which Ryan received when he testified as a government witness against two individuals convicted in a case reported in Marshall v. United States, 355 F.2d 999 (9th Cir. 1966). In that case there was testimony that Ryan had gambled with large stakes. The District Judge who tried the present case was United States Attorney at the time the Marshall case was on appeal to this Court. The Special Agents had made extensive examinations of the records of Ryan and of his domestic corporations, but they met resistance when they wanted him to bring all of the club's voluminous records from Africa. I.R.S. summonses had been issued for the identical records described in the grand jury subpoenas, but they were not enforced. The District Judge issued an order requiring Ryan to produce the records in Africa, and upon his failure to do so, issued a citation for civil contempt, which was later converted to criminal contempt. The contempt action was consolidated for trial with the indictment in the present case, but was later severed. In 1969

Chief Deputy Clerk Drew testified that the issuing clerk signs the subpoena, and affixes the seal of the Court at the time of its issuance.

Special Agent Hines of I.R.S. picked up the subpoenas upon instructions from his superior, and then departed for Riverside, California, where he met Special Agent Berry, who took possession of the subpoenas. They proceeded to Palm Spring, arriving there about 5:45 P.M., but they were unable to locate the witnesses and did not serve the subpoenas. Berry telephoned Nissen, who advised him to change the return date on the subpoenas to July 28. Berry crossed out the date of July 27 and wrote at the top of it, July 28, and initialed the change.[3] The subpoenas were served on the following morning, July 27th, around 10:00 o'clock. Arrangements were then made in Washington by counsel for the Government and the witnesses, for delivery of the documents to I.R.S. Agents. When Nissen was advised of this fact, he excused the grand jury from coming in on July 28.

Some time during the afternoon of July 27, Ryan inquired of his secretary whether she had carried out the instructions which he had given her some months previously, about the club records.[4] She advised him that she had started the work but had not finished it. Ryan told her to complete it, which she did by changing about twelve cards in the latter part of the afternoon or early evening of July 27.

On the following day July 28, Special Agent Davis, acting under authority of his supervisor, went to Palm Springs and met with Helen Hansen. She prepared a typewritten receipt on IRS Form 399, "Document Receipt", furnished to her by Berry, who signed it. Hansen then turned over to Berry two boxes of 3″ x 5″ index cards and a large drawer of records and folders. These records were kept in the IRS office in Los Angeles until August 4, 1967, when they were returned to Hansen at the request of Ryan's counsel, after they had been microfilmed.

Ryan endeavored to prove that IRS custody of the records had nothing to do with the grand jury, but the Court barred such evidence.

Pursuant to the second subpoena, the records were flown to Los Angeles for return to the grand jury. Hansen was called to testify before the grand jury on August 16, 1967, but by agreement of counsel she was not to testify about any change in the records. The so-called Robertson Grand Jury was discharged on September 27, 1967. More than fourteen months elapsed before another grand jury indicted Ryan.

Several things are noteworthy concerning the procedures in connection with the Robertson Grand Jury. There is no proof that it knew anything about the issuance of the three subpoenas on July 26th, or about the alteration in the return dates, or the service of the subpoenas by Special Agents of I.R.S., or

I.R.S. filed a 9.2 million dollar jeopardy assessment against Ryan's properties and business interests in various parts of the United States.

3. Rule 17(a), Fed.R.Crim.P., authorizes the clerk to issue a subpoena, signed and sealed, but otherwise in blank, to the party requesting it, who shall fill in the blanks before it is served.

4. Hansen testified that some time during the winter of 1966–67 Ryan told her that certain club records would be shipped to Africa, and that she should change the 3″ x 5″ active membership cards, which showed thereon that Frank Erickson was the donor of the membership, by deleting his name therefrom, because he did not want Erickson's name on the cards. She complied with his instructions by making out new cards for about half of them (down to the alphabet letters "M" or "N") and destroying the old cards. On the new cards she wrote, "Gift of C.H. and R.R." These were the initials of Carl Hirschmann and Raymond Ryan. Hansen testified that Ryan gave her no instructions to change the applications for membership, which showed Erickson as the donor, or to change any inactive membership cards, and she did not make any changes on either of them.

the arrangement for delivery of the subpoenaed documents to the Special Agents, or the excusing of the witnesses from appearance. The arrangements for excusing the witnesses and for delivery of the records to I.R.S. were made in Washington by counsel for the Government and the witnesses. Thus, by means of grand jury subpoenas, the I.R.S. obtained the records which it was unable to secure by an administrative subpoena.

After the verdict, Special Agent Glen Johnson testified at a hearing on a motion for judgment of acquittal that he learned of the alleged destruction of the records on July 25, 1967, or on the morning of July 26, 1967, and immediately notified Joyce of the Department of Justice in Washington. A fairly good inference may be drawn that this precipitated the issuance of the subpoenas for records, a portion of which had already been altered or destroyed.

Despite the Government's knowledge of the destruction of the records prior to the issuance of the subpoenas, counsel for the Government, in his argument to the jury, told the jurors that they could believe or disbelieve parts of the testimony of Government witness Hansen, and that the jury could find that all of the membership cards were destroyed after the subpoenas were issued and served. In our opinion, in view of knowledge to the contrary, this argument was improper.

The Court also excluded proffered evidence that Ryan and Hansen met with their counsel in Washington after the return of the records, and informed their counsel of the changes on the active membership cards, and instructed them to advise the Department of Justice attorneys of such change.

The Court also would not permit the defense to elicit from Department of Justice attorneys their knowledge of the fact that the cards had been changed prior to the time of their return in response to a second subpoena. The Court quashed subpoenas issued for Department of Justice Attorneys Petersen, Joyce and Lynch.

The evidence was proffered in connection with the cross-examination of Hansen as follows:

"MR. MILLER: At this stage of the game I would ask questions which will elicit from this witness the fact that she had informed me of the change in cards as did Mr. Ryan. That after the matter was discussed and she explained the cards to me I then and with their permission and direction went down and informed the Department of Justice on August 15, 1967, that they wished to make a full disclosure concerning this matter and that all of this occurred prior to the time the records were turned over to a federal grand jury. The records were in fact turned over to a grand jury August 16, 1967. And I would thus offer to prove that the Government had knowledge of the change at least on August 15, 1967.

"I would interrogate the witness as to these questions in the presence of the jury. I assume the Government will object and I am willing to take this statement as to what I would do rather than asking the questions in the presence of the jury.

"MR. MICHAEL: The Government would object on the grounds of hearsay —relevancy. In addition it does not concede or adopt in any way the statements made by Mr. Miller as to what he may have said to anyone in the Department of Justice.

"MR. MILLER: I am offering to prove——

"THE COURT: This is his offer of proof.

The objection is sustained on the further grounds it is beyond the scope of direct examination. It is not within the immunity is a further ground."

No objection to the proffer was made on grounds of immunity.

■ The other reason advanced by the Court for its exclusion of this evi-

dence was that the cross-examination was beyond the scope of direct examination. This rule ought not to be invoked to severely restrict the cross-examination of an accomplice. If Ryan committed any criminal act in causing records to be destroyed by Hansen, she was certainly an accomplice.

In Spaeth v. United States, 232 F.2d 776 (6th Cir. 1956) at 779, the Court said:

> "While the slogan that cross-examination should be limited to the subject matter brought out by direct-examination may be accepted as a generalization, cross-examination in the interest of substantial justice seeking to elicit relevant truth should not be narrowly curtailed."

The judgment of conviction in that case was reversed.

## CONSTRUCTION OF THE STATUTE

The pertinent provisions of the statute are:

> "Whoever corruptly . . . endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both." 18 U.S.C. § 1503.

■■ In Haili v. United States, 260 F.2d 744 (9th Cir. 1958), we held that association by defendant with a probationer in violation of terms of probation, did not violate the statute. The offense charged must be similar to those specifically enumerated in the statute, applying the doctrine of ejusdem generis. The statute is strictly construed. United States v. Essex, 407 F.2d 214 (6th Cir. 1969).

In *Haili*, the Court approved the decision in United States v. Scoratow, 137 F.Supp. 620 (W.D.Pa., 1956), which held that in order to constitute an offense under Section 1503, the act charged must be in relation to a proceeding pending in the federal courts, and that an investigation by the Federal Bureau of Investigation did not constitute a judicial proceeding.

■■ Similarly, an investigation by the Internal Revenue Service or by any other governmental agency would not constitute a judicial proceeding. I.R.S. had authority to issue summons requiring the production of books and records relevant and material to an inquiry, which may be enforced by the courts. 26 U.S.C. §§ 7602–7604. The test of materiality and relevancy is essentially the same as grand jury investigations, i. e., whether the inspection sought would throw light upon the correctness of the taxpayer's returns. Foster v. United States, 265 F.2d 183 (2nd Cir.), cert. denied, 360 U.S. 912, 79 S.Ct. 1297, 3 L. Ed.2d 1261 (1959).

■ Submitting to an Internal Revenue Agent a false document is a violation of 18 U.S.C. § 1001.

■ Disobedience or resistance to a lawful order of the court is a violation of 18 U.S.C. § 401(3).

■ Failure to obey a subpoena is contempt. Fed.R.Crim.P. 17(g). Taylor v. United States, 221 F.2d 809 (6th Cir. 1955), cert. denied, 350 U.S. 834, 76 S.Ct. 69, 100 L.Ed. 744 (1955).

The District Court stated at the hearings on post-trial motions:

> "The gravamen and thrust of the Government's case was that the grand jury was presented with records which were not the true records of the company. That is the simple gravamen of the offense."

The Court instructed the jury:

> "For example, endeavoring to obstruct Grand Jury functions is within the purview of Section 1503 as is endeavoring to provide a Grand Jury with misleading, false or altered records."

■ The fact that Ryan may have been guilty of contempt, or of some other crime with which he has not been charged, does not support the conviction in the present case and it cannot stand. Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); Marvin v. United States, 279 F.2d 451, 452 (10th Cir. 1960); United States v. Smith, 232 F.2d 570, 573 (3d Cir. 1956). See also Maggio v. Zeitz, 333 U.S. 56, 68, 68 S.Ct. 401, 92 L.Ed. 476 (1948).

In United States v. Metcalf, 435 F.2d 754, 756 (9th Cir. 1970), this Court held that Section 1503 was designed to protect participants in a specific proceeding to prevent a miscarriage of justice, and that the statute was not applicable until a complaint had been filed with a United States Commissioner.

■ The word "corrupt" in the statute means for an evil or wicked purpose.

■ Specific intent to impede the administration of justice is an essential element of the offense. Pettibone v. United States, 148 U.S. 197, 13 S.Ct. 542, 37 L.Ed. 419 (1893).

■ The Government states in its brief at page 10:

"Intent is not in issue." It certainly was in issue, and in our judgment, intent was not established beyond a reasonable doubt.

We have shown that before the records were subpoenaed the Government knew that some of them had already been destroyed. The Government takes the position that the offense was committed when the records were destroyed, even though Ryan may not have had any knowledge at the time that a grand jury investigation was contemplated. We disagree. United States v. Bufalino, 285 F.2d 408 (2d Cir. 1960). Ryan had given instructions to his secretary to delete Erickson's name from the 3″ x 5″ cards, months before the subpoenas were issued. She did make out new cards for about one-half of them before the subpoenas were issued

and served. All that Ryan told her after the subpoenas were served was to complete the work which he had previously instructed her to do.

The alteration of the records did not mislead I.R.S. nor the Grand Jury (if indeed it ever saw them), nor any one else. Ryan had given no instructions to Hansen with respect to the applications for membership which were not destroyed or altered. Twenty-one applications for membership were offered in evidence by the Government, of which *eighteen showed that Erickson was the donor of the memberships.* Thus it is clear that Erickson's donation of the memberships was not concealed from the grand jury.

It is also clear that the Special Agents of I.R.S. for a number of years had been investigating Ryan and his companies. As before stated, a jeopardy assessment of 9.2 million dollars was levied on Ryan's properties throughout the country. The Special Agents acquired possession of the subpoenaed records and microfilmed them. Yet no case for income tax evasion was submitted to the Robertson grand jury, nor so far as this record reveals, to any other grand jury.

There was not an iota of evidence in the record showing any relevancy of these membership cards to the grand jury investigation. The fact that Erickson paid for the initiation fees of certain individuals in the African club certainly had no relevancy to Ryan's income tax liability. Whether Erickson or the individual members paid for the memberships was wholly immaterial. Foster v. United States, *supra.*

The burden of proof was upon the Government to prove that the production of the membership cards would throw some light on the subject of the grand jury investigation. Foster v. United States, *supra.* It offered no proof.

■ The acts complained of must bear a reasonable relationship to the subject of the grand jury inquiry.

United States v. Siegel, 152 F.Supp. 370 (S.D.N.Y.1957), aff'd, 263 F.2d 530 (2d Cir. 1959), cert. denied, 359 U.S. 1012, 79 S.Ct. 1147, 3 L.Ed.2d 1035 (1959). Here they did not.

Also, we should point out that the Court read to the jury Count II of the indictment which contained language of what the grand jury was supposed to be investigating, as follows:

> "From on or about July 1, 1967 to on or about September 30, 1967, a Grand Jury duly empaneled and sworn on March 2, 1967, in the United States District Court for the Central District of California, was conducting an investigation to determine whether there were in the Central District of California violations of the conspiracy statute (section 371 of Title 18 United States Code) travel and transportation in aid of racketeering (section 1952 of Title 18 United States Code), extortion and robbery (section 1951 of Title 18 United States Code), perjury (section 1621 of Title 18 United States Code) . . . ."

In the first place, there was no evidence that the Grand Jury was investigating any of these matters. Nor was there any proof that Ryan was ever engaged in a conspiracy, violation of travel and transportation in aid of racketeering, extortion and robbery, or perjury. The Grand Jury did not indict Ryan for any of the above offenses that it was al-

leged to have been investigating. The reading to the jury of such irrelevant language from the indictment could operate only to the prejudice of Ryan.

The errors of the Court which we have pointed out require a reversal of the judgment.

▄ Ryan also urges upon us that the District Judge had a substantial interest in the issues of the present case and should have disqualified himself because of the fact that the *Marshall* case, so-called, involving Ryan as the victim, was on appeal when the Judge was United States Attorney. The name of the District Judge as United States Attorney headed a list of four Government lawyers on the Government's brief. The District Judge intimated at a pretrial hearing, however, that his appearance was merely formal and that he "didn't even read the brief in the Caifano case." (Marshall is an alias for Caifano.) Although the indictment of Ryan stemmed from proceedings against Marshall, there was no charge against Ryan involved in that case, and no prejudice to him has been shown. We hold that this claim is not well taken. However, we think that for the sake of appearances the District Judge would have been well advised to have asked the Chief Judge to assign this case to another Judge, and we feel confident that he will follow that course in respect to any other proceedings involving Ryan.*

---

* Other occurrences which motivate us in making this observation are:

The District Judge

(1) Accused Ryan of feigning illness at the start of the trial, exonerated his bail, and remanded him to the custody of the Marshal. We find no support for such action in the record. The appellate court reinstated his bail.

(2) Suggested to Ryan's counsel that Ryan in effect was obstructing justice by making changes in the bylaws after the issuance of letters rogatory, and instructed counsel "to tell your clients I am sick and tired of fencing with them in terms of these changes." Tr. March 19, 1969; Tr. March 20, 1969, p. 8.

(3) Told one of defense counsel, "Don't play games with me."

(4) Acted upon a 28 U.S.C. § 455 motion on the day it was filed and prior to the time it was formally set for hearing, even though counsel stated, "I am not arguing this mtoion to you at this time." Tr. June 8, 1970, p. 5.

(5) Granted *ex parte* motions of the Government charging Ryan with civil contempt, and later changed the charge to criminal contempt.

Because of these and other happenings at the trial, we feel that the District Judge would not want to sit in a contempt trial where he had acted as accuser, or in any other matters involving Ryan.

We further conclude that the evidence is insufficient to support the judgment of conviction on either obstruction of justice offense or 18 U.S.C. § 2(b).

We express no opinion with respect to the contempt citation. Other issues have been raised which we have considered, but which, in view of our disposition of the case, need not be discussed.

The judgment of conviction will therefore be reversed and the cause remanded to the District Court with instructions to enter a judgment of acquittal.

TRASK, Circuit Judge (concurring and dissenting).

I join in the order making the first two amendments which are to appear in footnote 2 of the opinion.

I disagree with the language of the paragraph to be substituted for the fourth paragraph from the end of the majority following the asterisk. Although I joined the majority in the paragraph as it appeared in the original slip opinion, the substituted paragraph goes far beyond this in an attempt to rule upon matters that are not properly before us.

My own examination of the *Marshall* case, United States v. Marshall, 355 F.2d 999 (9th Cir. 1966), convinces me that *Marshall* and *Ryan* are totally unrelated except for the fact that Ryan was a witness in the prior case. I find nothing in the record before us which establishes that "the indictment of Ryan stemmed from proceedings against Marshall," and no conflict of interest.

Assuming the statements ascribed to the district judge are perhaps immoderate (at least when read out of context) and his rulings erroneous, we have ruled on the *Ryan* case which was before us. There is no occasion to rule on all future *Ryan* cases which may come before this judge, or to assume that a district judge will not manage his cases properly. I find the criticism of the trial judge in this context entirely inappropriate.