**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Hakeem Abdul RASHEED, aka Clifford Jones, Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Janice PHILLIPS, Defendant-Appellant.**

**Nos. 80–1136, 80–1150.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 13, 1981.

Decided Oct. 5, 1981.*

Certiorari Denied Jan. 11, 1982.
See 102 S.Ct. 1031.

* Lodged with Clerk September 16, 1981.

Herbert Harris, Jr., New York City, for Rasheed.

Daniel F. Cook, Asst. Federal Public Defender, San Jose, Cal., for Phillips.

Ed Luckel, Asst. U. S. Atty., San.Francisco, Cal., Cedric C. Chao, Asst. U. S. Atty., San Francisco, Cal., on the brief, for U.S.A.

Before WALLACE and POOLE, Circuit Judges, and CORDOVA,** District Judge.

WALLACE, Circuit Judge:

Rasheed, the founder of a church, was indicted on six counts of mail fraud, 18 U.S.C. § 1341, one count of obstruction of justice, 18 U.S.C. § 1503, and one count of making a material false declaration to a grand jury, 18 U.S.C. § 1623. Phillips, his associate, was charged with five counts of aiding and abetting Rasheed in the conduct of his mail fraud scheme, two counts of obstruction of justice, and one count of making a material false declaration to a grand jury. They were tried together on all counts. The jury convicted Rasheed and Phillips on all the mail fraud counts. The jury also convicted Phillips, but acquitted Rasheed, on the obstruction of justice charges. The jury acquitted both on the false statement counts. Both raise several contentions on appeal, including charges that their First Amendment rights have been violated. We affirm the convictions.

I

In early 1977, Rasheed founded the Church of Hakeem. The Church was incorporated under California law, and received tax exempt status as a religious institution.

Rasheed preached about the importance of a positive self-image through belief in one's self. He taught that one could achieve one's desires by focusing and concentrating on those desires. The central tenet of the Church was the belief in "the God within you." One of the aspects of the Church's beliefs was the law of increase, or the law of cosmic abundance, which provided that if one gave freely one would receive returns greater than the initial gift.

Shortly after the Church was founded, Rasheed established the "Dare to be Rich" program. Rasheed preached that this program was consistent with the law of cosmic abundance. He taught that if one donated money to the Church, one would receive an "increase of God" of four times that amount within a particular period of time. The time period of the increase of God varied depending on the amount of the donation. Fourfold increases for donations of $1 to $249 were received in 70 days; increases for donations from $250 to $24,999 in 90 days; increases from $25,000 to $999,-

** Honorable Valdemar A. Cordova, United States District Judge, District of Arizona, sitting by designation.

999 in 9 months; and increases for donations of $1,000,000 or more in 3 years. These time periods were based on "psychic birth cycles," which Rasheed claimed had a basis in scripture. The cycles were supposed to coincide with levels of consciousness. The shortest cycle indicated that the donor had not transcended greed. Thus, donors were encouraged to give large amounts and to redonate their increases to the program to reach higher levels of consciousness.

Rasheed taught Church beliefs and about the "Dare to be Rich" program at frequent Church gatherings called "celebrations." Rasheed preached that members should spread the word regarding the Church and the "Dare to be Rich" program. There were also mailings to Church members that contained information about upcoming Church celebrations, and contained some of the teachings of the Church.

Donations to the "Dare to be Rich" program were made primarily at the Church celebrations themselves. Only Church ministers were permitted to participate in the program. To become a minister, one had to pay an enrollment fee to the Church. Once a minister, a person was entitled to make weekly donations to the "Dare to be Rich" program. At the end of an increase cycle, an "increase letter" stating the amount of the increase was prepared and given to the donor publicly at a celebration. If the minister was not present at the celebration, the letter would be mailed to him or her. The minister then made an appointment to consult with a Church counselor, at which time he or she could receive the increase completely in cash, or redonate all or part of it to the "Dare to be Rich" program. The counselors generally encouraged redonation.

At the outset of the program, Rasheed represented, through Church literature and through his aides at the Church, that the increases of God were from profits that the Church made on investments. The Church, according to Rasheed, chose not to keep these profits, but to distribute them to its active ministers. Subsequently, Rasheed downplayed the source of the funds. References to investments disappeared, and potential donors who questioned the source of the money were told they could not yet donate to the program because they lacked sufficient faith. Further, Rasheed never indicated that increase payments were coming solely from the donations of other members.

Rasheed was apparently very careful not to create the impression that a donation to the "Dare to be Rich" program created a legal obligation on the part of the Church to pay the increases of God. He instructed his aides never to tell potential donors that the Church was making any promise or guarantee of payment. He also instructed them not to use words like "security" or "stock." Nonetheless, many of his aides testified that Rasheed never indicated that there was any doubt that a donor would receive his increase.

Phillips became a minister of the Church in April 1978. In June 1978, she became a full-time employee of the Church, with the title of "Enlightenment Coordinator." Subsequently, she was appointed to the Church's Board of Directors. Phillips' responsibilities at the Church included oversight of the financial operations of the Church. She had control over the Church's bookkeeping, and set up ledger books that kept track of the cash flow of the "Dare to be Rich" program. She was also involved in the oversight of the program itself, in that she advised ministers on the operations of the program and told them what to tell potential donors.

Throughout 1978, the Church prospered. The Church purchased many expensive items, including a $900,000 yacht, and a $100,000 Rolls-Royce automobile. In January 1979, the "Dare to be Rich" program ceased to operate. The Internal Revenue Service seized the assets of the Church, which was the reason the Church gave for the stoppage of payments of increases of God. The increases never resumed. A grand jury began to investigate the activities of the Church in late 1978, and continued into 1979, when the indictments forming the basis of this case were handed down.

The essence of the mail fraud charges against Rasheed and Phillips is that the "Dare to be Rich" program was a fraud. The government alleged, and the defendants have never denied, that there were never investments that provided the source of increase of God funds. The government alleged, rather, that the "Dare to be Rich" program was based on pyramid planning, by which increases paid to early donors were paid from the funds provided by subsequent donors. The obstruction of justice and perjury counts involve events surrounding the grand jury investigation of the "Dare to be Rich" program. We shall discuss the facts surrounding those counts when we address the legal issues.

## II

Rasheed and Phillips contend that the free exercise clause of the First Amendment bars their convictions for mail fraud. The premise of their argument is that the "Dare to be Rich" program is a religious tenet of the Church of Hakeem, and that the First Amendment prevents the government from proving the falsity of a religious tenet. *United States v. Ballard*, 322 U.S. 78, 86–87, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944). They conclude that the government may not assert the falsity of the "Dare to be Rich" program, and that the government's mail fraud case must therefore fail.

Rasheed and Phillips are correct that the First Amendment protects absolutely the freedom of belief. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). The government is foreclosed from interference with one's faith. The First Amendment protects all religious beliefs, no matter how preposterous they may seem to the majority of the population. *United States v. Ballard, supra*, 322 U.S. at 87, 64 S.Ct. at 886. What one does with one's faith, however, may not necessarily enjoy the same absolute protection. The First Amendment protects religiously grounded conduct, but such conduct is subject, in some situations, to the police power of the government. *Wisconsin v. Yoder*, 406 U.S. 205, 220, 92 S.Ct. 1526, 1535,

32 L.Ed.2d 15 (1972); *Cantwell v. Connecticut, supra*, 310 U.S. at 303–04, 60 S.Ct. at 903. Therefore, inquiry into the conduct of Rasheed and Phillips in the operation of the "Dare to be Rich" program is not absolutely barred by the First Amendment. Recognizing this, Rasheed and Phillips still contend that the government's case necessarily requires inquiry into the truth or falsity of the doctrine underlying the "Dare to be Rich" program, and is therefore improper.

The nature of the Church of Hakeem, and its teachings as a whole, are not issues in this case. The government has conceded that the Church is a bona fide religious organization. Rather, the government contends that Rasheed and Phillips engaged in conduct based on knowingly false representations to induce others to donate money to the Church through the "Dare to be Rich" program. So analyzed, the issue in this case becomes whether Rasheed and Phillips held sincere religious beliefs in the allegedly fraudulent aspects of the "Dare to be Rich" program. If they made assertions with knowledge of the falsity of those assertions, then they could not have been acting pursuant to sincere religious belief. It, therefore, is not a question of whether the "Dare to be Rich" tenet is true or false. The focus is on the intent of Rasheed and Phillips in carrying out the program. It is this distinction that is critical in our First Amendment analysis.

Thus, the Court has held that although the validity of religious beliefs cannot be questioned, the sincerity of the person claiming to hold such beliefs can be examined. *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965). The First Amendment does not protect fraudulent activity performed in the name of religion. *Cantwell v. Connecticut, supra*, 310 U.S. at 306, 60 S.Ct. at 904. The district judge properly instructed the jury that specific intent to defraud is an element of the crime of mail fraud. *Williams v. United States*, 278 F.2d 535, 537 (9th Cir. 1960). To convict Rasheed and Phillips of mail fraud, the jury must have found that they knew of the falsity of their

statements pertaining to particular aspects of the "Dare to be Rich" program. It follows, of course, that the jury could not have believed that they had a sincere religious belief in those aspects of the program.

Because the jury necessarily found that Rasheed and Phillips lacked a sincere religious belief in certain aspects of the "Dare to be Rich" program, the only analysis left in the First Amendment claim is whether there was sufficient evidence to support this conclusion. In determining the sufficiency of the evidence of a criminal conviction, we must view the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed.2d 680 (1942). Fraudulent intent may be, and often must be, proven by circumstantial evidence. *United States v. Piepgrass*, 425 F.2d 194, 199 (9th Cir. 1970).

The evidence showed that, initially, all information concerning the "Dare to be Rich" program came directly from Rasheed. Later, Phillips also had a hand in dispensing information about the program. Several ministers who assisted in disseminating information about the program and in collecting donations testified that they never told any prospective donor anything that Rasheed or Phillips had not instructed them to say. They were told to state that donors would receive a fourfold increase of God after the appropriate time period, as determined by the amount of the donation. They were further instructed not to use words like "promise," "guarantee," "investment," or "security." Nonetheless, there was never any element of doubt, chance, or faith connected with the possibility of getting an increase. There was never any language in written solicitations of Church celebrations that one *might* receive an increase, or that one's increase was contingent on the strength of his belief in the teachings of the Church. Rather, typical statements were that one *would* receive an increase, or that, even though there was no guarantee, the increases always came.

The principal evidence of the fraudulent nature of the program, and of Rasheed's and Phillips' knowledge of the deceit, is the false impression they created concerning the source of the funds for the payments of the increases. At the outset of the program, Rasheed represented to his ministers and to potential ministers that the increases of God were gifts from the Church to ministers derived from profits that the Church made from its foreign investments in gold, diamonds, and oil. There is no evidence that any such foreign investments ever existed, that Rasheed ever believed that such investments existed, or that belief in the existence of foreign investments was part of Church doctrine. Indeed, Rasheed has not made any claim to the contrary. Subsequently, Rasheed instructed his aides not to respond to questions concerning the source of the increases. The stated reason for this was that one who made such an inquiry lacked sufficient faith to be permitted to participate in the program.

After she joined the Church, Phillips had the primary responsibility for the financial dealings of the Church. The Church kept two bank accounts, one called expenses and the other called secular increases. The payment of increases of God to church ministers came from the secular increase account. All of the funds that ever appeared in the secular increase account were transferred from the expense account. All the money that ever appeared in the expense account came from enrollment fees and donations to the Church from its ministers. There was no evidence of any Church income or any source of funds for the payment of increases other than payments made by the Church ministers. Thus, Phillips knew that the money used for increases of God came not from foreign investments but solely from money paid by other ministers.

The evidence is sufficient that a jury could find beyond a reasonable doubt that Rasheed and Phillips engaged in conduct that they knew was deceitful. They made representations concerning the source of the increase funds, and concealed the true source of the funds. *See Cacy v. United States*, 298 F.2d 227, 229 (9th Cir. 1961)

(concealment of a material fact is fraud within the scope of the mail fraud statute). They both continued to operate the program over a period of time with knowledge of their failure to disclose the true source of the increase funds. This intentional misrepresentation created valuable undue advantage for them, and thus was a scheme or artifice to defraud within the meaning of the mail fraud statute. *See United States v. Mandel,* 415 F.Supp. 997, 1005 (D.Md. 1976). If the truth had been revealed, a reasonably prudent person would have known that the "Dare to be Rich" program, was essentially a Ponzi scheme,[1] and that the fourfold increases could not possibly continue. *See United States v. Louderman,* 576 F.2d 1383, 1388 (9th Cir.) (*citing United States v. Mandel, supra*), *cert. denied,* 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978). Thus, contrary to the position of Rasheed and Phillips, it is immaterial whether the Church had any legal obligation to pay the fourfold increase.

We conclude that the jury, instructed properly, had sufficient evidence before it to find that Rasheed knew that he was misrepresenting the source of the funds for the payment of increases, and that Phillips knowingly aided and abetted Rasheed in the perpetration of the scheme. Thus, Rasheed and Phillips could have had no sincere religious belief in this aspect of the program, which they knew they were misrepresenting. Therefore, their First Amendment defense must fail. Rasheed and Phillips also contend that the mailings were so far removed from the fraud that the jurisdictional requirement of the mail fraud statute was not met. This claim is without merit.

## III

Rasheed and Phillips contend that the district judge erred in admitting computerized summaries of the Church of Hakeem records, and in permitting testimony concerning those summaries. The government offered the summaries to illustrate testimony of expert witnesses concerning the financial impact of the "Dare to be Rich" program. The government claims the summaries were necessary for the jury's overall understanding of the program.

The documents on which the summaries were based included Church receipts, ledgers, increase of God letters, checks, and substitute business records. Pursuant to a grand jury subpoena, the Church produced about 32,000 of its documents. The substitute business records were created as secondary evidence of the contents of documents, *see* Fed.R.Evid. 1004, that the government claimed had not been produced, because they were either missing, destroyed, or purposely withheld. The government states that when other Church records and Church procedures indicated that a document must have existed, the government created that document. As an example, the government claims that if other records indicated incontrovertibly that an increase letter must have been sent to a minister, then the government created such an increase letter and included it in the data base of the summaries.

In addition, the government included in its data base increases owed ministers after January 17, 1979, when the Church announced it was ceasing to pay increases. The government multiplied by four the amount of the donations made before January 17 that had increase dates after January 17. The government reasoned that this was necessary to determine the total liabili-

---

1. The Fifth Circuit has described the operation of a Ponzi scheme as follows:

 In a Ponzi scheme, a swindler promises a large return for investments made with him. The swindler actually pays the promised return on the initial investments in order to attract additional investors. The payments are not financed through the success of the underlying venture, but are taken from the corpus of the newly attracted investments.

 The swindler then takes an appropriate time to abscond with the outstanding investments. As one author has described it, "he borrowed from Peter to pay Paul. And it worked ... until Peter got wise."

 *United States v. Cook,* 573 F.2d 281, 282 n.3 (5th Cir.), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978). *See also Cunningham v. Brown,* 265 U.S. 1, 7–8, 44 S.Ct. 424, 425, 68 L.Ed. 873 (1924).

ty of the "Dare to be Rich" program. After generating the computer summaries, the government retained a private, independent accounting firm, which audited and verified the government's findings.

Rasheed and Phillips attack the admissibility of the summaries on two grounds. First, they argue that the summaries were inadmissible pursuant to Rule 403 because they created a "scientific aura" about the government's case, and thus were more prejudicial than probative. Second, they assert that the summaries were inadmissible pursuant to Rule 1006 because not all the documents on which the summaries were based were themselves admissible. They argue that the substitute records were inadmissible because the creation of the substitute records rested on the premise that the Church had a legal obligation to pay a fourfold increase to each donor. Further, they challenge the inclusion of increases allegedly due after January 17. They contend that this was improper because there was never any obligation to pay a fourfold increase, and that, because documents showing post-January 17 increases never existed, secondary evidence of the "contents" of these documents could not be admissible under Rule 1004.

■ The arguments of Rasheed and Phillips about the admissibility of the summaries are not of constitutional dimension. *United States v. Valle-Valdez*, 554 F.2d 911, 916 (9th Cir. 1977). Therefore, even if there was error, it is harmless unless it is more probable than not that the error materially affected the verdict. *Id.* at 915.

■ The summaries were admitted to show that the "Dare to be Rich" program was a Ponzi scheme that had collapsed. They tended to demonstrate that the Church's ministers had been defrauded. The mail fraud statute does not require proof that anyone has been defrauded.

*Farrell v. United States*, 321 F.2d 409, 419 (9th Cir. 1963), *cert. denied*, 375 U.S. 992, 84 S.Ct. 631, 11 L.Ed.2d 478 (1964). Such evidence may be relevant to show that a scheme to defraud existed. *Farrell v. United States, supra*, 321 F.2d at 419. There was other substantial evidence of the fraudulent activities of Rasheed and Phillips, including their knowingly false misrepresentations and concealments concerning the source of increase funds. The summaries were not necessary to the jury's verdict of guilt. Therefore, even if the admission of the summaries was error (and we offer no view on this issue), it would be harmless.

## IV

### A.

Phillips contests her conviction for obstruction of justice. She was charged with concealing and attempting to conceal certain ledgers and notebooks after receiving a grand jury subpoena duces tecum requesting production of church documents. A Church minister, Slack, testified that Phillips ordered him to conceal certain blue ledgers, which contained a page for each minister and reflected dates and amounts of each donation and increase of that minister, and to destroy certain red notebooks, which contained increase lists. Slack complied with this order, except he retained duplicates of the red notebooks. Phillips does not contest Slack's testimony. She does not claim that the ledgers and notebooks were not covered by the subpoena, though she claims they were "secondary records" that contained no information that was not found in the other records that she did produce. She does not dispute that she failed to turn the ledgers and notebooks over to the grand jury. Phillips contends, however, that this conduct is not within the reach of the obstruction of justice statute, 18 U.S.C. § 1503,[2] and that the district

2. Section 1503 provides:
 § 1503. *Influencing or injuring officer, juror or witness generally*
 Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other

judge improperly instructed the jury on this issue. She further contends that, even if the statute does proscribe such conduct, the evidence was insufficient to support her conviction.

Phillips argues the obstruction of justice statute covers only activities obstructing the administration of justice that involve force, threats, or intimidation. She contends that the statutory construction principle of *ejusdem generis* requires that the final "catch-all" clause of the statute be construed in light of the prior language concerning injuring or threatening people. She concludes that the statute cannot proscribe the concealment of subpoenaed documents.

We disagree with this position, but not on the basis argued by the government. The government contends that we have "clearly held" that concealment of documents is within the scope of section 1503, citing *United States v. Ryan*, 455 F.2d 728, 733–34 (9th Cir. 1972). In *Ryan*, we did not explicitly state that failure to comply with the subpoena duces tecum was a violation of section 1503. Even if this proposition is implicit in the opinion, which is highly doubtful, it is dicta. In *Ryan*, we reversed the defendant's conviction because the subpoenaed documents were immaterial to the grand jury proceedings. *Id.* at 734–35.

Phillips is correct that we have applied the principle of *ejusdem generis* to section 1503. In *Haili v. United States*, 260 F.2d 744 (9th Cir. 1958), we held that the phrase "due administration of justice" in the catch-all provision was limited by the prior enumeration of specific judicial functions. Therefore, we held that the interference

with the terms of another's probation was not an interference with the due administration of justice within the meaning of the statute. *Id.* at 745–46.

Some confusion has been caused by too literal a reading of *United States v. Metcalf*, 435 F.2d 754 (9th Cir. 1970). There we held that a defendant's attempt to obtain possession of an automobile that had been purchased with the proceeds of a bank robbery was not within the scope of section 1503. We reasoned that the automobile had not yet "become involved in a specific judicial proceeding" and, thus, there was no obstruction of the "due administration of justice" within the meaning of section 1503, as interpreted in *Haili*. *Id.* at 757. In addition, we observed that there were no threats or intimidation involved. We commented:

> [T]he general provision [of section 1503], although it refers to the broad range of "due administration of justice," prohibits only specified types of impeding acts—*i. e.*, "by threats or force, or by threatening letter or communication." Thus, not only must the broad term "due administration of justice" be limited to pending judicial proceedings, but also the manner in which the statute may be violated would ordinarily seem to be limited to intimidating actions.

*Id.*

Our statement in *Metcalf* that section 1503 "would ordinarily seem to be limited to intimidating actions" does not compel the conclusion that section 1503 does not encompass concealment of documents. First, the entire statement appears to be dicta. We were focusing upon whether a "judicial

proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such

juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or *corruptly* or by threats or force, or by any threatening letter or communication, *influences, obstructs, or impedes, or endeavors to* influence, obstruct, or impede, *the due administration of justice*, shall be fined not more than $5,000 or imprisoned not more than five years, or both.
(Emphasis added.)

proceeding" was involved. Second, we did not consider in *Metcalf* the "specified type of impeding act" on which the jury was instructed in this case. Indeed, in our statement in *Metcalf*, we did not even discuss the statutory alternative of impediment to due administration of justice by corruption. In contrast, in the case before us the district judge, quoting from section 1503, instructed the jury that Phillips could be found guilty for "corruptly" influencing, obstructing or impeding the due administration of justice or endeavoring to do so. The use of the word "corruptly" in the statute is a clear indication that not every violation of section 1503 involves threats or intimidation. For example, bribing a witness would certainly be a corrupt method of obstructing justice, but would involve no threat or intimidation. We have observed that the obstruction of justice statute was designed to proscribe all manner of corrupt methods of obstructing justice. *Catrino v. United States*, 176 F.2d 884, 887 (9th Cir. 1949). Our analysis must turn, then, to whether concealment of documents is a corrupt means of influencing, obstructing or impeding the administration of justice.

■ In *United States v. Ryan, supra,* we said, in dicta, that "[t]he word 'corrupt' in [section 1503] means for an evil or wicked purpose." *United States v. Ryan, supra,* 455 F.2d at 734. Black's Law Dictionary defines "corruptly" to mean with "a wrongful design to acquire some pecuniary or other advantage." Black's Law Dictionary 414 (4th ed. rev. 1968). We hold that the word "corruptly" as used in the statute means that the act must be done with the purpose of obstructing justice. Decisions of other circuits support this position. *United States v. Ogle*, 613 F.2d 233, 238 (10th Cir. 1979), *cert. denied*, 449 U.S. 825, 101 S.Ct. 87, 66 L.Ed.2d 28 (1980); *United States v. Haas*, 583 F.2d 216, 220 (5th Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1788, 60 L.Ed.2d 240 (1979).

■ Using this definition of "corruptly," the destruction or concealment of documents can fall within the prohibition of the statute. This holding does no violence to

our rule that the catch-all provision of section 1503 is limited by the prior specific prohibitions of the statute. The act of destroying or concealing subpoenaed documents is "similar in nature," *Haili v. United States, supra,* 260 F.2d at 746, to the enumerated acts. The destruction or concealment of subpoenaed documents results in the improper suppression of evidence, and thus the influencing, obstructing and impeding of judicial proceedings, just as much as does the intimidation of a witness. *United States v. Walasek*, 527 F.2d 676, 679 n.11 (3d Cir. 1975). That one act suppresses testimonial evidence, while the other act suppresses real evidence is of no importance. *See generally United States v. Faudman*, 640 F.2d 20, 23 (6th Cir. 1981); *United States v. Griffin*, 589 F.2d 200, 203 (5th Cir.), *cert. denied*, 444 U.S. 825, 100 S.Ct. 48, 62 L.Ed.2d 32 (1979); *United States v. Cohn*, 452 F.2d 881, 883–84 (2d Cir. 1971), *cert. denied*, 405 U.S. 975, 92 S.Ct. 1196, 31 L.Ed.2d 249 (1972); *United States v. Solow*, 138 F.Supp. 812, 815 (S.D.N.Y. 1956).

### B.

■ Having determined that the statute encompasses the acts charged, the issues of jury instructions and sufficiency of the evidence require little analysis. The district judge quoted pertinent parts of the statute to the jury, instructed that "corruptly" meant any "endeavor" to obstruct justice, and defined "due administration of justice." He instructed that to convict the defendant, the jury must find that the grand jury was engaged in the due administration of justice, that Phillips knew the grand jury was conducting an investigation, that Phillips knew what documents were covered by the subpoena, and that, knowing that the particular documents were covered by the subpoena, she willfully concealed or endeavored to conceal them from the grand jury. There is no error in these instructions taken as a whole.

Phillips' arguments on the district court's failure to give a proffered instruction and on the sufficiency of the evidence are simi-

lar. She argues that when she appeared before the grand jury, she testified that she had not produced all the documents called for by the subpoena. She claims that the government excused her from further production, and that she had never concealed the fact that there were records that had not been produced. She argues that there was insufficient evidence of concealment, and that the jury should have been instructed that the government's oral modification of the subpoena was a defense.

 This position ignores the fact that the section 1503 violation was complete when the documents were directed to be destroyed or concealed. Phillips had already ordered the destruction or concealment of documents that she was required to produce. Aside from the prosecutor's possible lack of awareness that the destroyed or concealed documents had ever existed when he excused Phillips from further production, his actions in no way negate the commission of the crime. At best, his relieving Phillips of further production indicates that justice was not, in fact, obstructed. This is not a defense. Section 1503 proscribes endeavors to obstruct and actual obstruction is not an element of proof. *Osborn v. United States*, 385 U.S. 323, 333, 87 S.Ct. 429, 434, 17 L.Ed.2d 394 (1966). There is substantial evidence that at the time the documents were ordered destroyed or concealed, Phillips had the intent to obstruct justice and endeavored to do so. This is sufficient for guilt under section 1503. The district judge, thus, did not err in refusing to instruct that if Phillips believed the documents were no longer called for, her prior intent to obstruct would be negated.

## V

Phillips asks that we exercise our supervisory authority to dismiss the indictment for prosecutorial misconduct. She alleges that the prosecutor improperly posed questions to her attorney, who was appearing as a witness before the grand jury, that elicited responses in breach of her attorney-client privilege.

In January 1979, several weeks after Phillips' appearances before the grand jury, Malamuth, then the attorney for the Church of Hakeem, came into possession of certain Church documents. These documents included the ledgers and notebooks that Slack had concealed and were the subject of the obstruction of justice counts against Phillips. After advising Phillips to turn over these documents voluntarily, and after Phillips failed to do so, Malamuth had an *in camera* conference with the district judge. The district judge granted Malamuth permission to withdraw from his representation of the Church, ordered him to deliver the documents to the grand jury personally, and ordered him to testify concerning the circumstances surrounding his acquisition of them. Malamuth claims that he subsequently reviewed the law of attorney-client privilege, and concluded that he had no basis on which to disobey the district judge's order.

The next day, Malamuth delivered the documents to the grand jury, and testified concerning what they were, how he had acquired them, and what he had discussed with Phillips and other members of the Church in the previous few days concerning their production. The substance of this testimony was that he had recommended that the documents be produced, that apparently Phillips and others had agreed to contact the prosecutor to arrange for their production, and for some reason had failed to do so. Malamuth also testified that he felt betrayed by the Church leaders because of their initial failure to produce the documents, and their subsequent failure to produce them after he acquired them.

 A court may invoke its supervisory power to dismiss an indictment for flagrant prosecutorial misconduct only where there is a clear basis in law and fact, and when necessary for the preservation of the integrity of the judicial process. *United States v. Samango*, 607 F.2d 877, 880–81 & n.6 (9th Cir. 1979). The arguments made by Phillips in this case present neither a clear basis for dismissal, nor a necessity for invoking this remedy.

■ Phillips has not satisfied her initial burden to show that there was in fact a violation of the attorney-client privilege in this case. The record is inconclusive as to the extent of Malamuth's representation. He was the attorney for the Church, but apparently not for Phillips personally. Although he may have represented her in her Church capacity, it is not clear that he ever represented her in an individual capacity. Whether Malamuth's representation extends to the precise issue before us is in doubt. Further, it is not clear that whatever statements of Phillips that Malamuth testified to were stated to him in confidence.

Even if a privilege did exist, there is substantial doubt whether Malamuth's testimony was in breach of the privilege. Because Malamuth was in possession of documents that Phillips had failed to produce to the grand jury pursuant to a valid subpoena duces tecum, he was in danger of becoming an accessory to the obstruction of justice. *See generally In re Ryder*, 263 F.Supp. 360 (E.D.Va.), *aff'd*, 381 F.2d 713 (4th Cir. 1967). *Cf.* Code of Professional Responsibility, Disciplinary Rule 4–101(C)(4) (attorney may reveal confidences necessary to defend against charge of wrongful conduct). More important, Malamuth had been ordered by the district judge to produce the documents and to testify. This order was necessary to prevent further deception of the grand jury and to permit the grand jury to perform its function properly. *Cf. id.* 4–101(C)(2) (attorney may reveal confidences when required by law or court order). Unless the privilege is proven to exist, the prosecutor could not, of course, be charged with its violation.

In addition, absent unusual circumstances, an attorney is in a better position to protect the confidences of his client and to know the scope of the privilege with his client than is the prosecutor. *See In re Walsh*, 623 F.2d 489, 495 (7th Cir.), *cert. denied*, 449 U.S. 994, 101 S.Ct. 531, 66 L.Ed.2d 291 (1980). In light of the circumstances, the prosecutor committed no misconduct by questioning Malamuth about the documents and about Malamuth's conversations with Phillips.

## VI

Phillips contends that it was error for the district court to deny her motion for severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure. She does not argue that joinder was improper pursuant to Rule 8. Rather, she contends that a joint trial with Rasheed prejudiced her because most of the evidence concerning the "Dare to be Rich" program involved acts committed prior to her joining the Church.

■ The government concedes that the evidence against Rasheed was much stronger than the evidence against Phillips. This alone, however, is insufficient for severance. *United States v. Gaines*, 563 F.2d 1352, 1355 (9th Cir. 1977). Rather, in ruling on appeals from denials of motions to sever, we have said:

> These contentions are to be tested by whether a joint trial would be so prejudicial to a defendant as to require the exercise of the trial judge's discretion in only one way; to order a separate trial. The burden of proving this prejudice is a difficult one and the ruling of the trial judge will rarely be disturbed. It is not sufficient that a separate trial might offer a defendant a better chance of acquittal. Rather, the ultimate question is whether under all of the circumstances, it is within the capacity of the jurors to follow the court's admonitory instructions and, correspondingly whether they can collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements, and conduct.

*United States v. Brady*, 579 F.2d 1121, 1127–28 (9th Cir. 1978), *cert. denied*, 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979).

■ In this case, there was never any attempt to confuse the date of Phillips' joining the Church. Phillips' trial counsel repeatedly objected to the introduction of evidence concerning acts prior to the date of her joining the Church. In response to these objections, the district judge re-

peatedly instructed the jury that they were not to consider any of this evidence against Phillips unless they found that she had later ratified or adopted the prior acts. Phillips has shown nothing to indicate that the jury was unable to compartmentalize the evidence. Indeed, the jury showed its ability to do so by acquitting Rasheed on the obstruction of justice charges, while convicting Phillips. On this record, we are unable to say that the district judge abused his discretion in denying Phillips' motion to sever.

AFFIRMED.